IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| DONALD ZIMMERMAN, | § | |
| PLAINTIFF, | § | |
| | § | |
| V. | § | CAUSE NO. 1:15-CV-628-LY |
| | § | |
| CITY OF AUSTIN, | § | |
| DEFENDANT. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On December 14, 2015, the court called the above styled and numbered cause for bench trial. Plaintiff Donald Zimmerman appeared in person and through counsel. The City of Austin appeared through counsel. The parties concluded their presentations of evidence on December 15, 2015, and subsequently submitted post-trial briefs. Having carefully considered the pleadings, exhibits, trial testimony, arguments of counsel, and the applicable law, the court makes the following findings of fact and conclusions of law.[1]

The court has jurisdiction over this case pursuant to Title 28 of the United States Code, Sections 1331 and 1343. This civil action arises under the First and Fourteenth Amendments of the United States Constitution and Title 42 of the United States Code, Section 1983.

### I. BACKGROUND

In 1997, the citizens of the City of Austin (the "City") voted with a 72% majority to add to the Austin City Charter Article III, Section 8, governing financing of Austin City Council campaigns. In 2006, 68% of Austin voters voted to revise Article III, Section 8 to, *inter alia*: raise the individual contribution limit to $300, indexed for inflation; raise the

---

[1] All findings of fact contained herein that are more appropriately considered conclusions of law are to be so deemed. Likewise, any conclusion of law more appropriately considered a finding of fact shall be so deemed.

aggregate limit on contributions from groups and individuals outside the City to $30,000 in a general election and $20,000 in a runoff election, each indexed for inflation; and modify the requirements for the disbursement of campaign funds after an election. The provisions remain in effect today.

By this suit, Zimmerman challenges these provisions of the 2006 version of Article III, Section 8 of the Austin City Charter. Zimmerman was elected to serve on the Austin City Council in 2014, and is a candidate for re-election in the City's general election to be held November 8, 2016. The challenged provisions are applicable to Zimmerman's re-election campaign. Each challenged provision is discussed individually below. Zimmerman seeks a declaratory judgment that the challenged provisions are unconstitutional and a permanent injunction enjoining the City from enforcing the provisions.

## II. ANALYSIS

"Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution." *Buckley v. Valeo,* 424 U.S. 1, 14 (1976). The First Amendment affords the broadest protection to such political expression in order to assure the "unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States*, 354 U.S. 476, 484 (1957); *see also Buckley*, 424 U.S. at 14. "[T]here is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966). "This of course includes discussions of candidates…and all such matters relating to political processes." *Id.* at 218-19. The United States has a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376

U.S. 254, 270 (1964). "In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation." *Buckley*, 424 U.S. at 14-15. "[I]t can hardly be doubted that the constitutional guarantee [of the First Amendment] has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971).

To this end, the First Amendment protects political association as well as political expression. *Buckley*, 424 U.S. at 15. *Buckley* and its progeny instruct that we should give varying levels of constructional scrutiny to campaign-finance regulations depending on the type of regulation at issue in order to "draw the constitutional line between the permissible goal of avoiding corruption in the political process and the impermissible desire simply to limit political speech." *McCutcheon v. Fed. Election Comm'n*, 134 S. Ct. 1434, 1441 (2014).

"[E]xpenditure limitations…represent substantial rather than merely theoretical restraints on the quantity and diversity of political speech." *Buckley*, 424 U.S. at 21. These restrictions "limit political expression 'at the core of our electoral process and of the First Amendment freedoms.'" *Id.* at 39 (citing *Williams v. Rhodes*, 393 U.S. 23, 32 (1968)). "A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Buckley,* 424 U.S. at 19. Expenditure limitations therefore are subject to strict scrutiny, "the exacting scrutiny applicable to limitations on core First Amendment rights of political expression." *Id.* at 44–45. A regulation limiting expenditures may only be upheld if the regulation "promotes a compelling interest and is the least restrictive means to further the

3

articulated interest." *McCutcheon*, 134 S. Ct. at 1444. "Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *NAACP v. Button*, 371 U.S. 415, 438 (1963).

"The right to participate in democracy through political contributions is protected by the First Amendment, but that right is not absolute." *McCutcheon*, 134 S. Ct. at 1441. "By contrast with a limitation upon expenditures for political expression, a limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication" and therefore receives a lessened, but nonetheless rigorous, level of scrutiny. *Buckley*, 424 U.S. at 20. Contribution limitations may be upheld if the regulating governmental unit "demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms." *Id.* at 25. A closely drawn limitation on campaign contributions "leav[es] persons free to engage in independent political expression, to associate actively through volunteering their services, and to assist to a limited but nonetheless substantial extent in supporting candidates and committees with financial resources" and "do[es] not undermine to any material degree the potential for robust and effective discussion of candidates and campaign issues by individual citizens, associations, the institutional press, candidates, and political parties." *Id.* at 28-29.

Under each of the tests, the government—here the City—has the burden of demonstrating the constitutionality of the regulations. *McCutcheon*, 134 S. Ct. at 1452. With regard to both expenditure and contribution limitations, the Supreme Court has identified only one legitimate governmental interest: preventing *quid pro quo* corruption or its appearance. *Id.* at 1450–51. "That Latin phrase captures the notion of a direct exchange of an official act for

4

money." *Id.* at 1441; *see also McCormick v. United States*, 500 U.S. 257, 266 (1991); *McDonnell v. United States*, 579 U.S. ___, Case No. 15-474, slip op. at 22 (2016) (defining *quid pro quo* corruption as "the exchange of a thing of value for an official act"). Governmental entities "may not regulate contributions simply to reduce the amount of money in politics, or to restrict the political participation of some in order to enhance the relative influence of others. *McCutcheon*, 134 S. Ct. at 1441. "[G]overnment regulation may not target the general gratitude a candidate may feel toward those who support him or his allies, or the political access such support may afford." *Id.* "Spending large sums of money in connection with elections, but not in connection with an effort to control the exercise of an officeholder's official duties, does not give rise to...*quid pro quo* corruption." *Id.* at 1450. In determining whether the City has demonstrated a legitimate interest in preventing *quid pro quo* corruption or its appearance, the court cannot "accept[] mere conjecture as adequate to carry a First Amendment burden." *Id.* at 1452.

### A. Base Limit

Zimmerman first challenges the provision of the Austin City Charter that prohibits a candidate for Mayor of Austin or the Austin City Council from accepting more than $300[2] from any one person per election. Austin City Charter, Art. III, § 8(A)(1) (the "Base Limit").

Zimmerman argues the Base Limit is a content-based restriction and therefore subject to strict scrutiny because it does not apply to contributions to incumbent candidates for officeholder expenses. *See Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2231 (2015). Regulation of speech is content-based if it applies to particular speech because of the topic discussed or the idea or message expressed. *Id.* at 2227. In *Reed*, the Supreme Court

---

[2] Indexed for inflation. *See* Austin City Charter, Art. III, § 8(A)(1).

concluded that restrictions on different categories of signs, such as "ideological signs," versus "political signs," were content-based regulations and therefore subject to strict scrutiny. *Id.*

The Base Limit at issue in this case is dissimilar from the regulations in *Reed*. The Base Limit applies to all campaign contributions and does not distinguish between types of speech or ideas conveyed. The Base Limit does not address the content of the regulated speech in any manner. The court concludes that the Base Limit is not a content-based restriction.

The Base Limit is properly construed as a restriction on campaign contributions and is therefore subject to the "closely-drawn" test. *See McCutcheon,* 134 S. Ct. at 1445. The City has the burden of demonstrating that the Base Limit serves "a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgement of associational freedoms." *See Buckley,* 424 U.S. at 25. In *Buckley*, the Supreme Court upheld a $1000 limit on contributions to candidates for federal office. *Id.* at 143. The Court found that "the weighty interests served by restricting the size of financial contributions to political candidates are sufficient to justify the limited effect upon First Amendment freedoms caused by the $1000 contribution ceiling." *Id.* at 29. The Court reasoned that "to the extent that large contributions are given to secure a political quid pro quo from current and potential office holders, the integrity of our system of representative democracy is undermined." *Id.* at 26-27. Further, "[o]f almost equal concern as the danger of actual quid pro quo arrangements is the impact of the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions." *Id.* at 27. The Supreme Court later stated in *Nixon v. Shrink Missouri Government PAC* that "there is little reason to doubt that sometimes large contributions will work actual corruption of our political system, and no

reason to question the existence of a corresponding suspicion among voters." 528 U.S. 377, 395 (2000).

The City presented evidence at trial that there was a perception of corruption in Austin before the City adopted a limit on campaign contributions in 1997. David Butts, a campaign consultant involved in Austin city elections since 1977, testified that large contributions, in the $1000-$2500 range, sometimes as high as $10,000, from developers, engineering firms, banking institutions, architects, and law firms created a widespread perception in the community that economic interests, such as those in the land development arena, had "inordinate influence" over the Austin City Council and were "corrupting the system." Fred Lewis, who worked on campaigns for the Austin City Council and Mayor in the early 1990s, testified that the City Council was seen as a "pay-to-play system," where a contributor "paid in contributions and in exchange...got development rights." Lewis also testified that he was involved when the City Council proposed increasing the Base Limit in 2006, and that the City Council's goal in raising the limit was to balance between "allow[ing] candidates to raise more funds to get their message out with the need to prevent the appearance of *quid pro quo* corruption." Furthermore, the fact that 72% of Austin voters voted in favor of the Base Limit in 1997 suggests that at least the perception of corruption as a result of large contributions existed in Austin at that time. *See Nixon*, 528 U.S. at 394 ("And although majority votes do not, as such, defeat First Amendment protections, the statewide vote on [contribution limits] certainly attested to the perception relied upon here: An overwhelming 74 percent of the voters of Missouri determined that contribution limits are necessary to combat corruption and the appearance thereof.") (internal citations omitted). The court concludes the Base Limit serves

the City's sufficiently important interest of addressing *quid pro quo* corruption and its appearance.

Zimmerman further argues that the Base Limit is not closely drawn as a means of addressing the appearance of *quid pro quo* corruption. The Supreme Court stated in *Buckley* that "a limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication." 424 U.S. at 20. "Even a significant interference with protected rights of political association may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms." *Id.* at 25 (internal citations omitted). The Court specifically rejected the contention that $1000 or any other amount was a constitutional minimum below which legislatures could not regulate. *Id.*; *see also Nixon*, 528 U.S. at 397. The Court instead asked whether there was any showing that the limits were so low as to impede the ability of candidates to amass the resources necessary for effective advocacy. *Buckley*, 424 U.S. at 21.

Expounding on *Buckley,* the Supreme Court in *Nixon* reversed the Eighth Circuit's holding that a $275 limit on contributions to candidates for state representative was unconstitutional. 528 U.S. at 397. The Court explained the appropriate inquiry is "whether the contribution limitation [is] so radical in effect as to render political association ineffective, drive the sound of a candidate's voice below the level of notice, and render contributions pointless." *Id.*

The Supreme Court later stated in *Randall v. Sorrell*, "[w]e cannot determine with any degree of exactitude the precise restriction necessary to carry out [a contribution limit's]

8

legitimate objectives." 548 U.S. 230, 248 (2006). "In practice, the legislature is better equipped to make such empirical judgments, as legislators have particular expertise in matters related to the costs and nature of running for office." *Id.* (internal citations omitted) (holding unconstitutional statutes limiting contributions to $200 in gubernatorial race and significantly lower amounts in state Senate and House of Representatives races).

This court recognizes the tautology that the more money a candidate has, the more he or she will be able to communicate with the public. However, Zimmerman's evidence does not reveal that the Base Limit renders political association ineffective or drives candidates' voices below the level of notice. Zimmerman called several political consultants as witnesses to show that there are many expensive elements of campaigns, from lists of email addresses of potential donors to the fees of political consultants themselves. Zimmerman also called Marco Mancillas, an unsuccessful candidate for Austin City Council in the 2014 election. Mancillas testified that there were people that would have donated more than the amount permitted by the Base Limit to his campaign. He posited that would have allowed him to send out more direct mail, make more phone calls, and have more people canvassing. However, Mancillas also testified that he spent about $24,000 on his 2014 campaign, roughly $300 less than Zimmerman, who won in a different district. Further, Mancillas confirmed that he received only 77 votes, and a candidate that spent under $600 received 224 votes, almost three times as many as Mancillas, suggesting that inability to raise more money from individual donors might not have been the source of Mancillas's difficulty.

Moreover, the City presented testimony from former Austin City Councilmember Laura Morrison that the Base Limit was not an impediment to running a full-fledged campaign for Austin City Council in 2008. Morrison testified that being constrained by the Base Limit

meant that she was "out there talking to a heck of a lot more people than just, say, one person who gave me $100,000; that's good for democracy."

The court concludes that the City's interest in preventing *quid pro quo* corruption and its appearance justifies the limited effect upon First Amendment freedoms caused by the Base Limit. With regard to the specific amount of the Base Limit, the court gives deference to the legislative branch of government, here the City, which is "better equipped to make…empirical judgments…related to the costs and nature of running for office." *See Randall*, 548 U.S. at 248 (2006).

Zimmerman has not shown that the Base Limit of $300, indexed for inflation, is so low as to impede the ability of candidates to amass the resources necessary for effective advocacy. *See Buckley*, 424 U.S. at 21.

The court concludes that the Base Limit, like the restriction in *Buckley*, has only a limited effect on Zimmerman's First Amendment freedom, that the City's legitimate interests are served by the limit, and the limit therefore passes constitutional muster.

### B. *Blackout period*

Zimmerman next challenges the provision of the Austin City Charter that prohibits candidates for Mayor of Austin or the Austin City Council from soliciting or receiving contributions until 180 days before Election Day. Austin City Charter, Art. III, § 8(F)(2) (the "Blackout Period").

Temporal bans on contributions are subject to the "closely-drawn" test. *See Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 432 (5th Cir. 2014). The City must show that the Blackout Period serves a sufficiently important interest and employs closely drawn means to do so. *Id.* ("Even though the aggregate limit at issue here is only temporary, and,

after the 60-day window passes, the general-purpose committee is largely free to spend as it pleases, Texas must still show that the 60-day, 500–dollar limit employs means closely drawn."); *see also McCutcheon*, 134 S. Ct. at 1452 (holding aggregate limits on total contributions to all candidates in election are not closely drawn to avoid unnecessary abridgment of associational freedoms, reasoning that "once the aggregate limits kick in, they ban all contributions of any amount"); *Gordon v. City of Houston, Tex.*, 79 F. Supp. 3d 676, 689 (S.D. Tex. 2015). In *Catholic Leadership,* the Fifth Circuit held unconstitutional a provision of the Texas Election Code that prohibited a general-purpose committee from engaging in more than $500 of political contributions during a 60-day window. 764 F.3d at 445. The court reasoned that a temporal restriction on contributions that "kicks in regardless of the proximity…to a legislative session or a judicial election is vastly overbroad." *Id.* at 433.

In *Thalheimer,* the Ninth Circuit upheld a ban on contributions to candidates outside of a 12-month pre-election window. 645 F.3d at 1122. The court relied on the lower court's reasoning that "contributions made near an election are clearer expressions of political speech, whereas 'off-year contributions' are more likely linked to business the donor has before the city, thus creating the appearance of quid pro quo 'corruption by the sale of influence.'" *Id.* at 1121; *see also North Carolina Right to Life, Inc. v. Bartlett*, 168 F.3d 705 (4th Cir. 1999) (upholding statute placing hold on lobbyists' ability to contribute while legislature is in session because hold prevents corruption and the appearance of corruption).

In *Gordon*, the United States District Court for the Southern District of Texas granted a preliminary injunction enjoining enforcement of a temporal ban on candidates for city offices soliciting or receiving contributions at all times except for nine months before an election and four months after. 79 F. Supp. 3d at 690-91. The court concluded that the City of Houston

failed to establish that the temporal ban advances the prevention of *quid pro quo* corruption or its appearance because the city did not cite any evidence "showing how contributions given before February 1st of an election year present a different threat of *quid pro quo* corruption or its appearance from those given after February 1st." *Id.* at 691. This court finds the logic of *Gordon* persuasive.

Here, the City presented ample evidence that the Blackout Period is not a significant burden on candidates' fundraising, including testimony from Lewis that the "vast majority" of funds is raised within the three months immediately preceding an election, and testimony from Morrison that she worked on matters other than fundraising to lay the groundwork for her campaign until the Blackout Period was over. The City also presented testimony from Dr. Jonathan Krasno, an Associate Professor of Political Science at Binghamton University, that money flowing in before important votes is a "fairly standard concern."

The City, however, did not present evidence or argument to show how a contribution made seven months before election day presents a different threat of *quid pro quo* corruption than a contribution made three months before election day. *See Gordon*, 79 F. Supp. 3d at 691. As Lewis testified, the Austin City Council is in session and voting on matters year-round, so the danger that contributions would influence votes is no less a concern in the six-month window in which fundraising is allowed than during any other time of the election cycle. Further, the six-month window at issue here is more restrictive than the twelve-month window addressed in *Thalheimer*. *See* 645 F.3d at 1122. A contribution seven months before an election is more likely to be intended for use in a candidate's campaign than an "off-year" contribution more than twelve months before an election.

Finally, the Base Limit is a more closely-drawn measure in place to limit contributions to an amount that does not incentivize candidates to engage in *quid pro quo* corruption regardless of when a contribution is made. *See Catholic Leadership*, 764 F.3d at 436 ("[The state] advances no reason why more narrowly tailored base contribution limits...would not similarly serve its interests."). The City has demonstrated neither that the Blackout Period serves the City's sufficiently important interest of preventing *quid pro quo* corruption, nor that the Blackout Period is closely drawn to avoid unnecessary abridgment of associational freedoms. *See Buckley*, 424 U.S. at 25.

The court concludes that the City has not tied the Blackout Period to any sufficiently important City interest, resulting in the ordinance being an infringement of Zimmerman's First Amendment freedom of association.

### C. *Aggregate Limit*

Zimmerman also challenges the provision of the Austin City Charter that prohibits a candidate for Mayor of Austin or Austin City Council from accepting more than $30,000[3] in a general election and $20,000[4] in a runoff election from sources other than natural persons eligible to vote in a zip code completely or partially within city limits of the City of Austin. Austin City Charter, Art. III, § 8(A)(3) (the "Aggregate Limit").

Both contributing persons and contributed-to candidates can have sufficient injuries-in-fact to challenge campaign-finance restrictions. *Catholic Leadership,* 764 F.3d at 423. To establish standing, Zimmerman must show that: (1) he has suffered, or imminently will suffer, a concrete and particularized injury-in-fact; (2) the injury-in-fact is fairly traceable to the

---

[3] Indexed for inflation. *See* Austin City Charter, Art. III, § 8(A)(3).

[4] Indexed for inflation. *See* Austin City Charter, Art. III, § 8(A)(3).

defendant's conduct; and (3) a favorable judgment is likely to redress the injury-in-fact. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992); *Justice v. Hosemann*, 771 F.3d 285, 291 (5th Cir. 2014). The basic inquiry is whether the "conflicting contentions of the parties…present a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). "To prove an injury in fact sufficient to raise a First Amendment facial challenge…a plaintiff must produce evidence of an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute." *Nat'l Fed'n of the Blind of Tex., Inc. v. Abbott*, 647 F.3d 202, 209 (5th Cir. 2011). When a plaintiff has alleged an intention to engage in a course of conduct proscribed by statute that is arguably affected with a constitutional interest, and there exists a credible threat of prosecution thereunder, he should not be required to await and undergo prosecution as the sole means of seeking relief. *Id*. But "persons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs." *Younger v. Harris*, 401 U.S. 37, 42 (1971). When plaintiffs "do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible," they do not allege a dispute susceptible to resolution by a federal court. *Babbitt*, 442 U.S. at 299.

In the 2014 City of Austin election, the Aggregate Limit indexed for inflation was $36,000 in the general election and $24,000 in the runoff. Zimmerman received less than $3,000 in the general election and less than $5,000 in the runoff election from sources other than natural persons eligible to vote in a zip code completely or partially within Austin city limits. In fact, only two of the more than 70 candidates in the general election received half or more of the $36,000 limit, and only one candidate in the runoff election received half or more

14

of the $24,000 limit. Zimmerman did not present evidence at trial demonstrating a likelihood or a potential that he would come closer to reaching or exceeding the Aggregate Limit in a subsequent election.

The court concludes that Zimmerman has not shown that he has or imminently will suffer a concrete and particularized injury-in-fact fairly traceable to the Aggregate Limit. Zimmerman therefore does not have standing to challenge the Aggregate Limit.

### D. Dissolution Requirement

Finally, Zimmerman challenges the provision of the Austin City Charter that requires a candidate for Mayor of Austin or the Austin City Council to distribute the balance of funds received from political contributions in excess of any remaining expenses for the election no more than 90 days after an election to (1) the candidate's contributors, (2) a charitable organization, or (3) the Austin Fair Campaign Fund; except that a successful candidate (an officeholder) may retain up to $20,000 for officeholder expenditures. Austin City Charter, Art. III, § 8(F)(3) (the "Dissolution Requirement").

The Eighth Circuit analyzed a similar provision in *Shrink Missouri Government PAC v. Maupin* and determined the provision should be subject to strict scrutiny. 71 F.3d 1422, 1428 (8th Cir. 1995). The court reasoned that the dissolution provision could be interpreted as a requirement to speak in the current election or as a restriction on expenditures in potential future elections, and is subject to strict scrutiny in either case. *Id.; see also Wooley v. Maynard,* 430 U.S. 705, 714 (1977) ("[T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all."); *McCutcheon,* 134 S. Ct. at 1444 ("[E]xpenditure limits...may regulate protected speech only if such regulation promotes a compelling interest and is the least

restrictive means to further the articulated interest."). This court agrees that the Dissolution Requirement is subject to strict scrutiny.

The Eighth Circuit struck down the dissolution provision at issue in *Maupin* because it was not narrowly tailored to serve a compelling government interest. 71 F.3d at 1428. The court rejected the state's argument that the dissolution requirement "ensur[es] the opportunity of all citizens, not just those who have amassed large war chests in noncompetitive races, to participate in the political process as candidates" and reasoned that "the contributor's political free speech interests are not well served if a candidate is compelled (1) to waste campaign contributions on unnecessary speech (in order to spend down the campaign's accumulated assets) or (2) to turn over those contributions to the Missouri Ethics Commission or return them to contributors." *Id.*

The City first argues Zimmerman does not have standing to challenge the dissolution requirement because the amount of his outstanding debt exceeded the balance of his funds remaining after the 2014 election. Zimmerman finished the 2014 race with approximately $1,200 remaining, which required disposal in compliance with the Dissolution Requirement. The City refers to Section 2-2-43 of the Austin City Charter to assert that a candidate must use excess funds to pay down campaign debt. The provision reads:

> The existence and amount of a campaign debt relating to a prior campaign period shall be determined based on the actual outstanding obligations of the candidate or campaign committee as of the date of the election for which the debt is incurred, and all funds held by the candidate or candidate's campaign committee in cash or bank accounts on that date shall be considered an offset to the campaign debt.

Austin City Charter § 2-2-43. This provision deals with calculation of campaign debt and does not require that a candidate use excess campaign funds from the candidate's election to pay off

16

debts. The fact that the amount Zimmerman's of outstanding debt exceeded the balance of his remaining funds does not negate his standing to challenge the Dissolution Requirement.

The City also argues that the Dissolution Requirement serves the purpose of reducing *quid pro quo* corruption or its appearance by preventing candidates from creating "war chests" for later campaigns and discouraging people from coming in at the last minute and giving money to the likely winner of the election. However, the City does not explain or present evidence to show how a "war chest" or these last minute contributions implicate *quid pro quo* corruption or its appearance.

In its brief, the City asserts that once it became clear that Morrison would win in the 2008 runoff election, she returned to her campaign office and found "envelopes full of contributions that came from erstwhile opponents," which "may have been legal, but…certainly have a certain aroma to them, an aroma that could only be worse, in corruption terms, without the individual limits." This is the type of "mere conjecture" the Supreme Court has stated is not "adequate to carry the government's First Amendment burden." *McCutcheon*, 134 S. Ct. at 1452. "Spending large sums of money in connection with elections, but not in connection with an effort to control the exercise of an officeholder's official duties, does not give rise to…*quid pro quo* corruption." *Id.* at 1450. "[G]overnment regulation may not target the general gratitude a candidate may feel toward those who support him or his allies, or the political access such support may afford." *Id.* at 1441.

And finally, the Base Limit is a more narrowly tailored measure that, as the City points out, provides a protection from these last minute contributions being accepted by a candidate as *quid pro quo*. *See Catholic Leadership*, 764 F.3d at 436 ("[The state] advances no reason why more narrowly tailored base contribution limits…would not similarly serve its interests.").

The City has demonstrated neither that the Dissolution Requirement "promotes a compelling interest," nor that it is the "least restrictive means to further the articulated interest." *McCutcheon*, 134 S. Ct. at 1444.

The court concludes that the Dissolution Requirement is unconstitutional as an undue restriction on Zimmerman's protected speech under the First Amendment.

### E. Conclusion

The court finds and concludes that (1) the Base Limit is a constitutional regulation of protected First Amendment activity, (2) the Blackout Period is unconstitutional under the First Amendment, (3) Zimmerman does not have standing to challenge the Aggregate Limit, and (4) Dissolution Requirement is unconstitutional under the First Amendment. The court will render separately a final judgment enjoining the City from enforcing the Blackout Period and the Dissolution Requirement.

SIGNED this _____ day of July, 2016.

LEE YEAKEL
UNITED STATES DISTRICT JUDGE